Good morning and welcome to the Ninth Circuit. It's a pleasure to be with you this morning and I am excited to be here with my colleague Judge Sanchez. Judge Sanchez and I both want to thank Judge Ezra for joining us sitting by designation. Thank you so much for the privilege. All right, so we have a few cases this morning that have been submitted on the briefs and so for the record, I'll recite those. That's Padilla-Sarmiento versus, I guess now Bondi, and Packwood versus County of Contra Costa, and Hubbard versus Nation Star Mortgage, and Beckue versus Bondi. So that leaves us three cases for argument this morning. For those of you who are representing the appellants, I just remind you that the time showing on the clock is your full time. If you want to reserve a few minutes for rebuttal, please let us know and we'll try to assist and give you a cue for that. And so we will start this morning with Aguilar Garcia versus Bondi. Good morning, Your Honors. May it please the Court, Raja Giorgiani, on behalf of the petitioner Ricardo Aguilar Garcia, pro bono, I'd like to reserve four minutes for rebuttal. This case is about whether the government can rely on illegally obtained evidence to prove alienage. Petitioner's position is that they cannot, and that his DACA documents and statements regarding his place of birth and his I-213 must be excluded based on a legal taint. There are three principal issues here. The government made a promise to the petitioner. The promise was enforceable for several reasons. The information obtained from the broken promise warranted oppression. Now, the BIA made several reversible errors as it adjudicated these issues. The BIA erred when it relied on boilerplate disclaimer language in the government's information-sharing policy to find that the government had made no promise to the petitioner. The government's reliance on boilerplate disclaimer language to get out of promises that it has made has been rejected in this circuit. In both Eshop Perez and Regence, the Ninth Circuit found that the same or similar disclaimer language was not dispositive as to whether or not the government had made enforceable promises. So the BIA's holding contradicts the law in this circuit. Now, courts have found that if disclaimer language contradicts the terms of the policy itself, it may not be enforceable. So had the government said, we're going to try to avoid information sharing, but we make no promises, then its policy and its disclaimer would be consistent with each other. But that's not what it said here. So can I start with the preliminary question? Excuse me. One of your arguments is that the submission of this DACA evidence was in violation of the district court's injunction in Casa de Maryland. Yes, Your Honor. Does that injunction apply to your client if his DACA status lapsed? Yes, Your Honor, because the promise made to the petitioner was not that for as long as he is in DACA status, the information will not be shared. And actually, that's also not a term by which the injunction itself was conditioned. It was that information submitted by DACA requesters based on the 2012 information sharing policy was to be protected unless the petitioner fell within one of the exceptions. So the Department of Homeland Security actually gave itself a very large out. And if the petitioner had some criminal history that caused him to fall within one of the exceptions to the information sharing policy, then DHS didn't make a promise. And I want to get to that in a second, but presumably the, and I know the injunction was itself vacated by the Fourth Circuit, you know, I guess maybe six months later, but to the extent that the injunction is trying to enforce this information sharing policy, why would it apply to someone who is no longer within the thought of class needed for protection, you know, current DACA recipients? Well, Your Honor, because that's a great question. And the answer is that the information sharing policy was put in place by the Department of Homeland Security because the Department of Homeland Security wanted to incentivize people coming out of the shadows, right, to lure people out of the shadows to say, hey, we have this program called DACA. It's a government program to succeed. And we want to let you know that in this particular instance, not on other applications, but in this particular instance, we're going to make an exception for DREAMers. We're going to make an exception for people in this class. So if you come forward and give the Department of Homeland Security information that may be used to deport you, we promise not to use that information for enforcement purposes unless you fall within one of the exceptions. So do you, I guess now getting into the policy language and other things, but do you, so what was the agency's error? Was it supposed to interpret the scope of the injunction and decide whether it applied or should not apply there? Well, the agency's error in this case is that it passed the buck completely. The Board of Immigration Appeals did not at any point find that it had any power to do anything with the injunction. It held solely that the authority to enforce the injunction lies with the district court. But the petitioner had never asked the Board of Immigration Appeals or the Immigration Court to enforce an injunction, certainly to enforce an injunction, for example, to see — I guess I'm sorry to interrupt, but the injunction says that any request for deviation from this order shall be submitted on a case-by-case basis to this court for in-camera review. So I can understand why the agency would be reluctant to want to wade into interpreting the scope of the injunction if the court's order itself said, take it up with us, the  Your Honor, the only thing that the petitioner has asked the agency to do is to find that evidence tainted with illegality can't sustain DHS's heavy burden. So the Board of Immigration It was submitted in violation of a law, whether it was admissible, whether its use was fundamentally fair, and we would argue that evidence submitted in violation of a binding nationwide injunction in place at the time, issued by a court in which DHS was a party, would make the use of those documents fundamentally unfair. Do you think that the government's use of the DACA information violated the 2018 NTA policy? That's a great question. So, Your Honor, the information-sharing policy is governed by the 2011 NTA memo. We're going to get there, but first answer my question. If we were to conclude that the 2018 NTA policy applies, not the 2011 policy, did what the government did here violate the 2018 policy? There are two memorandums that were issued on June 28th of 2018. One changed the NTA guidance under the new administration. A second one came in and said that the first one applies to all cases except for cases involving the DACA requesters. Does that make sense? And so that is on page 483 of the record. So the second, so the two memorandum happened and the government actually cites to the wrong memo, which may be part of the confusion here. Both of them are dated June 28th, 2018. One says we changed the NTA criteria. Fine. And if that one applied, Your Honor, I think maybe he would fall under that one. But the second one says — Okay. So that's what I'm getting at. Yes. That's what I'm getting at. If the 2018 NTA policy applies to this case, would you agree that the use of the DACA information did not violate that policy? Your Honor, I haven't looked closely enough at it because it's not the NTA memo that actually governs this case. But again, that's not the memo that governs this case. So the June 28th, 2018 second memo says that when we're dealing with information provided by DACA requesters, the first memo does not apply. And in that — Well, it says that except for it limits it. It says it doesn't apply in two circumstances. And those circumstances are when you're processing an initial DACA request or a DACA renewal request or if you're looking at possible termination of DACA relief. And neither of those things are happening with the petitioner in this case. So I don't — I don't see that that DACA NTA policy that you're referencing, the more specific policy, applies here. Your Honor, on page 485 of the record, and I'm looking at the second memo here, it says that — it specifically says that the information-sharing policy is governed by the 2011 NTA memo. So in June of 2018, which was just within a couple months of this violation, the Department of Homeland Security reiterates — reiterates that it's the 2011 NTA memo that governs in situations — In specified circumstances, right? Including those where we're talking about information submitted by DACA requesters. Unless they fall within the exception, the very large exception, in the 2011 NTA memo. And the petitioner does not fall within that exception. Well, I'm not sure — let's say you're correct and it is the 2011 policy memo that does apply. The information-sharing is not allowed except for certain categories of criminal offenses that have been committed. And one of those categories is the non-egregious public safety criminal cases. So why — and I know there's a dispute about whether your client was arrested for domestic violence, but why would an arrest for a DUI and for carrying a concealed firearm with ammunition not qualify under this non-egregious public safety criminal cases category? Thank you, Your Honor. So the non-egregious public safety category that you're looking at on 477 specifies that a criminal offense that is not on the egregious public safety list that makes a person inadmissible or deportable would suffice. So you have to — That sounds pretty broad, right? A criminal offense that's not on the — and I don't think anyone's disputing that it's the list of egregious ones. Yes, Judge. But why isn't a DUI or carrying a concealed firearm a criminal offense that would then allow for information sharing? Because essentially the rules of criminal inadmissibility are governed by INA 212A2. And California firearms offenses and California DUIs do not fall within any ground of 212A2. They're not crimes involving moral turpitude, and I'm not sure what other ground they could possibly — But why does this policy memo only refer to crimes — it's just — I mean, you were just reading that language to me broadly, and it's a crime — a criminal offense that's not listed in the category of egregious offenses. Your Honor, I respectfully — if it appears that the alien is inadmissible or removable for a criminal offense not included on the EPS list — so not just inadmissible for any reason and not just having had any crime. The language is if it appears that the person is inadmissible or removable — Where are you reading from? Page 477, non-egregious public safety criminal cases. So you have to — and so you have to be inadmissible or removable for a criminal offense. Put a different way, you have to have something that falls under 212A2 or 237A2, and it doesn't here. And may I just point out, in the little time that I have left, that the Board of Immigration Appeals actually never found that the Petitioner fell within the exception. That wasn't the basis upon which the Board or the agency denied. The agency didn't even get there. The agency just said no promise was made to the Petitioner, and it did so by relying on disclaimer language that the courts have repeatedly found is not dispositive. Ambiguous, boilerplate disclaimer language is not dispositive as to these issues. I have under four minutes. Do you want to reserve the rest of your time?  Okay. Yes. That's fine. Thank you, Judge. All right. We'll hear from the government. Good morning, Your Honors. May it please the Court, Remy Derocha-Afuju, representing the Attorney General of the United States. The petition for review should be denied, Your Honors. Petitioner failed to make a prima facie case showing that DHS egregiously violated his Fourth Amendment right when it issued a detainer and warrant for his arrest based on probable cause and in accordance with its regulations. We made that argument on page 28 of our brief, Your Honor, and we noted again that this Court has held that the Fourth Amendment violations are egregious if they are made in bad faith, and that is when evidence is obtained by deliberate violations of the Fourth Amendment or by conduct a reasonable officer should have known is in violation of the Constitution. Can I back you up just a little bit? Yes, Your Honor. I'm curious what the government's position is where procedurally here we had this injunction in place that was stopping new guidance for how DACA information was going to be treated. That injunction was in place when the immigration judge made its decision, and then it had been removed or vacated by the time the Board of Immigration Appeals is making its decision. What do we do with that? Well, Your Honor, as rightly pointed out earlier, Petitioner was no longer a DACA recipient as of the time that the injunction was in place. And so it is highly questionable that the injunction actually applied to Petitioner. And again, as you rightly pointed out, the injunction was invalidated by the Fourth Circuit. Right, but it's an interesting issue to think about. If the immigration judge's decision, let's assume for purposes of the question the immigration judge's decision did violate the injunction, what do we do with that when we're reviewing the VIA's review of the immigration judge's decision? Your Honor, the immigration judge's decision did not violate the injunction. I'm asking you to assume for purposes of my question that there was a problem with the immigration judge's decision. Even if there was a problem with the immigration judge's decision, assuming on the Board's subsequent decision, the — the — as the Board rightly said, that — the enforcement of that injunction was with the appropriate — within the jurisdiction of the court. And Petitioner never petitioned to the court and lost, you know, the ability to argue that case before the Fourth Circuit, which specifically mandated that any case should be brought to the court for in-camera review. But shouldn't — wouldn't the answer then be on the other side, well, then the government shouldn't have brought this into evidence at the removal hearing. That if before the government brought this in or before the IJA allowed it, it should have made a request before the district court. And again, that comes to your question earlier as to whether it actually applied to the Petitioner because he was out of DACA status. He never renewed his DACA application. It expired on October 24, 2015, and this injunction came in on March 5, 2018. So it's — But assuming — I mean, to get back to Judge Forrest's question, assuming that he was within the purview of the injunction, and you have an IJA allowing this information in, potentially in violation of the injunction, but then the injunction goes away by the time the Board of Immigration Appeal hears it, what do we do with that? That's a strange situation. Yes, it is. It is, Your Honor. But there is no remedy. Petitioner has not shown that a remedy for that is what he asked for, which is termination of his proceedings because he has not — he has not shown that he was harmed by this in any way because he basically was just delaying the inevitable, which is being placed in removal proceedings. I mean, is it like a harmless error analysis, that by the time it gets to the BIA, the — that information would have been allowed into the proceeding, or — Yes, Your Honor, and also because the language of the courts of the district court was somewhat ambiguous because the district court did acknowledge in its decision that the court — that the government did not state that it could not be — the documents could not be relied upon, but then stated in the final paragraph of the decision that it wanted — it mandated in-camera review of DACA applicants' data. And again, as you rightly pointed out, Your Honor, Petitioner's DACA status expired on October 24, 2015, which was way before this. I guess I don't understand that point. What does it matter that the DACA status has expired? Because the whole point was, if you apply for this type of relief, we won't use those — the information that you give us against you for enforcement purposes. Why wouldn't that be true, regardless of whether the person was still under DACA status or even ever acquired DACA status? In this case, Your Honor, because of Petitioner's exposure to law enforcement and his, you know, arrest for very serious criminal offenses, he fell within the purview of the memo which created that exception for the issuance of the NTA. And so the agency was — acted properly in using that information. Well, I understand that argument. And that makes — that makes more sense to me than saying that none of this applied to him because he was no longer a DACA recipient. Well, that was just — it could have been the reasoning of the agency. When they looked in the database, they may not have seen that he was a DACA recipient because they looked into so many databases. They looked into Lex. I mean, in — on — in the I-213, from I-213, the agency outlined all the steps that it took to figure out what to do to — to figure out Petitioner's alienage. And probably because his DACA application had expired, the agency probably — the databases probably didn't flag Petitioner as a DACA recipient. And that probably led to that. So I know there's a disagreement between the sides about which policy memoranda would apply in 2018 versus 2011. Let's assume it's 2011. Can you tell me your view of the — of this category of the non-egregious public safety criminal cases and whether the — the crimes for which he was arrested would qualify under that category? Yes, they would qualify under that category. And how do — and how do we know that? DHS has its standards for issuing NTAs and for putting a Petitioner in proceedings. And based on the fact that they received these information from the various databases, they decided that this Petitioner was an enforcement priority based on the firearms violation in the record. Is there anything in the policy memorandum that gives — sheds light on — on what this category means? Yeah, the policy memorandum is really broad. And it cannot basically enumerate every single offense that would be categorized as falling under that standard. But based on the fact that a firearms offense, an alien is not supposed to have — to be in possession of firearms offense — firearms in the first place. And because it's a weapons charge, the agency determined that this person was subject to enforcement action. And if it's the 2018 memoranda, I take it you would say it's the same thing? As we argued in our brief, yes, Your Honor, it is. He would qualify as an NTA. And again, the issue here is that Petitioner freely admitted to DHS that — he freely admitted his citizenship and his alienage to a DHS official who met him at the detention center. So — and there was no coercion at all when DHS asked him for that information. So there was nothing egregious, going back to the standard for reviewing these types of cases, Your Honor. Petitioner has made no showing whatsoever that DHS's violations — DHS's actions were an egregious violation of the Constitution at all. I take it, though, Petitioner's argument there is that before he made these statements that are in the I-213, the only way that Department of Homeland Security knew in order to go to the jail was by using the docket information, his alienage, which is — which was itself the violation. Yes, Your Honor. And even if it was a violation, it was not made in bad faith that Petitioner has not made that showing. It was not egregious, as in cases where the agency used race in the Sanchez case. Here, even if the agency was not supposed to use the DACA documents, it was not an egregious violation. It was not a violation of any statute. It was a policy memo, which the courts have ruled that the agency has the ability to use the DACA documents. And so there was no — the standard, again, is the egregious violation and acting in bad faith. None of that happened in this case. And what's the case that you rely on that gets the egregiousness standard? There was Sanchez v. Sessions, where the court determined that the aliens' detention, based solely on race, was egregious. And we argued here that the sheriff's office merely shared Petitioner's release dates with DHS based on a lawful detainer and arrest warrant, based on probable cause. Isn't that about the sheriff, though? Pardon me? Isn't that about the sheriff, as opposed to — Yeah, that is about the sheriff, but — I mean, but is that — so is that the standard to apply when it's about the government that has, in its own policy, said, we are not going to share information? Do we apply an egregiousness standard in that circumstance? No, to the — even to the — well, that's — I mean, I'm talking within the federal government umbrella. Information from the DACA database goes to Department of Homeland Security for purposes of removal. Yes, yes. Is that — you still believe that that's an egregiousness standard to apply? If the — based on the argument that Petitioner is making, that sharing that particular — that establishes alienage was egregious conduct, we do not agree with that. Okay. Yes, Your Honor. I just have a factual question. When this petitioner was picked up by federal authorities from the local jail, I guess, had an NTA issued at that point? The record is not exactly clear whether an NTA was issued, but it appears that an NTA probably was issued, which is usually the standard operating procedure for the agency, because it states in the I-213 that the alien would be processed for an NTA. It did state that clear, and usually what the agency does is to process the NTA, and then when the alien is brought in or found, they serve the NTA on the petitioner. So in this case, that looks — it looks like they did that, and DHS issues NTAs all the time. There are several NTAs issued that have not been — that were not able to serve on the petitioner because they didn't have the petitioner's address, because the NTA was found legally insufficient later based on a review of the record. So in this case, there is no indication that the NTA was not prepared at all, because — Well, I think you're right in your very first statement of saying it's a little ambiguous on this record. My question was more sort of typical practice, just because I'm not — Yeah, it is. I'm not sure how this normally goes. The NTA, it seems to me, is sort of comparable to a charging document in the criminal world, and you wouldn't necessarily have that document issued when an arrest occurs. So I'm just trying to figure out, in immigration proceedings, sort of what is the typical experience? The typical experience, Your Honor, is for the agency to look at the record and say, oh, this person is amenable to removal, prepare the NTA, then get the alien and serve the NTA on the alien, and that's what happened in this case. So they didn't deviate from the record. So basically, again, petitioner has never asserted that his admissions about his alien agent nationality to the DHS officer who arrested him were coerced. That is clear. He gave it. He was willing, and he was not forced. And lastly, there is no remedy for petitioner in this case. Petitioner does not have a form of relief available to him. Counsel will argue that not being placed in proceedings is a form of relief, but that's only postponing the inevitable. Eventually, he would have been an alien. He would have to be placed in proceedings and removed. And so the agency did not do anything wrong here. He was not unjustly detained or imprisoned. The detention was only for a few hours. And so there was nothing egregious, going back to the standard again, for reviewing these kinds of cases. And again, petitioner has no form of relief available. And so removability is inevitable for petitioner. There's no remedy for petitioner in terms of what happened, even if for some reason the court finds that there was some sort of violation. There's no remedy for petitioner. He hasn't established what the remedy would be. It certainly wouldn't be termination. There's nothing in the court cases that states that termination of proceedings is the appropriate remedy. Thank you very much, Your Honors. If you don't have any more questions. All right. Thank you for your argument. Thank you. If it doesn't appear, there are more questions. Counsel, before you start, if I may, one of the things that's been going through my mind as I've been reviewing this case is exactly the point that has just been made by government's counsel. And that is, what actually is it that you could achieve here? I mean, is it a Pyrrhic victory? I mean, your client appears to be headed down the road to deportation in any event. So where is the relief? Well, Your Honor, termination under Sanchez is a form of relief. And we see it in government, in criminal cases. Well, I know that, but that wouldn't — this Court wouldn't be issuing some order saying he can stay in the United States permanently. I mean, that wouldn't happen. No, Your Honor. And the Petitioner isn't asking this Court for that order. The government put the Petitioner in removal proceedings. The government violated the law in the way that it went about doing that. And just as the many criminal cases where there might even be evidence of guilt, but sometimes criminal cases have to be thrown out where the government violates the law, this would be a similar — this would be a similar situation. I'd love to address a few points. The government — under Chenery, this Court is limited to reviewing the reasons invoked by the agency below and may not entertain post hoc rationalizations by government counsel during appellate litigation. And that's what you heard from my friend, the Respondent. They argue that, you know, the issue about the vacator, the BIA never found, never denied Petitioner's case because the Fourth Circuit had vacated the injunction at the time. Even if they had, I will just point out that the Petitioner has multiple other theories under which the documents could be excluded, including violations of the Accardi Doctrine, violations of the rules of inadmissibility, and so on and so forth. Similarly, the BIA also never found that the Petitioner fell within the exception. So these things — these issues are not properly before the Court on review. As far as the Court's concern about De Novo, the De Novo question, the BIA's De Novo review doesn't change the fact that DHS's use of DACA documents for enforcement purposes occurred in 2018. So De Novo review allows a court to not have to defer to the previous court's legal conclusions, but it can't change the facts of the case. And the violation is frozen in time. It happened in 2018. At that time, it was a violation of the policy. It was a violation of the injunction. It was a violation of the rules of inadmissibility, and so on. Can I ask — can I ask about that, counsel? I mean, you're raising an interesting point about Chenery, but you're teeing up the notion that there was a violation of the injunction by not excluding the evidence. And the BIA does seem to pass on that issue to a certain extent by saying it's up to the district court. And so why would that preclude us as a panel to then observe the fact that the Fourth Circuit had actually vacated that injunction? Why does that preclude us from making that observation if we disagreed with you? Your Honor, just — so we're not asking this court to find that the BIA violated the injunction. The BIA was supposed to determine whether the evidence is fair, whether the evidence is fundamentally fair so that it can be admitted and used in removal proceedings. And we're saying that evidence submitted in violation of a binding nationwide injunction in place at the time, as well as under other theories, made the evidence unfair. I think Petitioner cannot be left without a remedy where the government violated, amongst other things, this Federal court injunction in Plains Fight. Such a holding would require the court to abandon issues of basic fairness and would greenlight future abuse. Your Honor, the Supreme Court famously stated in 2021, if men must turn square corners when they deal with the government, it cannot be too much to expect the government to turn square corners when it deals with them. We believe that justice requires that the government go through the necessary trouble of lawfully removing a person who has continuously resided in the United States for over a quarter of a century. It may mean more work, but it may be what justice requires. Thank you so much. All right. I want to thank both counsel for your helpful argument in this case. Aguilar-Garcia v. Bondi will be submitted. I also want to take the opportunity to specifically thank Petitioner's counsel who accepted this case pro bono. We always appreciate it when counsel will assist by representing litigants who don't otherwise have counsel. So thank you very much.
judges: FORREST, SANCHEZ, Ezra